IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CINDY L. CRIBBS,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )   Civil Action No. 10-1561
                                    )
MICHAEL J. ASTRUE,                  )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
            Defendant.              )

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Cindy L. Cribbs, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying her applications for disability
insurance benefits ("DIB") and supplemental security income
("SSI") under Titles II and XVI, respectively, of the Social
Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f.[1]  Presently
before the Court are the parties' cross-motions for summary
judgment pursuant to Fed.R.Civ.P. 56.  For the reasons set forth
below, Plaintiff's motion for summary judgment will be granted
insofar as this Social Security case will be remanded for

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system.  With respect to Plaintiff's claim for DIB, her earnings record shows
that she has acquired sufficient quarters of coverage to remain insured
through December 31, 2011.  (R. 12).

further proceedings, and the Commissioner's cross-motion for summary judgment will be denied.

## II. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on April 4, 2008, alleging disability since January 15, 2007 due to bipolar II disorder,[2] severe back pain, asthma and migraine headaches. (R. 99-108, 135). Plaintiff's applications were denied and she requested a hearing before an administrative law judge ("ALJ"). (R. 76-82). Plaintiff, who was represented by counsel, testified at the hearing which was held on December 16, 2009. A vocational expert ("VE") also testified. (R. 44-62).

The ALJ issued a decision on January 12, 2010, denying Plaintiff's applications for DIB and SSI based on his determination that, despite her physical and mental impairments, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[3] (R. 10-18). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on January 22, 2010. (R. 1-6). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

---

[2] Bipolar disorder is a serious mental illness. People who have it experience dramatic mood swings. They may go from overly energetic, "high" and/or irritable, to sad and hopeless, and then back again. They often have normal moods in between. The up feeling is called mania. The down feeling is depression. www.nnlm.nih.gov/medlineplus/bipolardisorder ("Medlineplus").
[3] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a).

III. **BACKGROUND**

Plaintiff testified at the hearing before the ALJ as follows:

Plaintiff was born on January 4, 1962, and she is a high school graduate. Plaintiff worked as a bartender/waitress at The Old Place Inn from 1988 to April 2007, when she was terminated as a result of her bipolar disorder.[4] (R. 47-48, 52, 57, 136).

In January 2005, Plaintiff underwent back surgery by Dr. Daniel Bursick, a neurosurgeon. At the time of the hearing, Plaintiff continued to suffer from low back pain, as well as neck pain. In lieu of further surgery, Dr. Bursick recommended a course of pain management. As a result, Plaintiff was being treated at Office-Based Anesthesia Solutions, Inc. with injections and medication. (R. 53, 137).

Plaintiff suffered from migraines several times a year due to her neck problem. She also suffered from asthma for which she used an Advair inhaler.[5] As to other medications, Plaintiff was taking Vicodin and Neurontin for neck and back pain as

---

[4] In this connection, Plaintiff testified: "It made my employer nuts. I was having - I would flip out, say crazy things, make scenes in the restaurant and he just couldn't have that anymore." (R. 57).
[5] Advair is a combination of medications that is used to prevent wheezing, shortness of breath and breathing difficulties caused by asthma and chronic obstructive pulmonary disease. Medlineplus.

3

needed, Depakote and Seroquel for her bipolar disorder, and
Klonopin for panic attacks as needed.[6]  (R. 54-56).

## IV. MEDICAL EVIDENCE[7]

Dr. Jack Mannheimer, a psychiatrist, performed an initial
evaluation of Plaintiff on April 12, 2007.[8]  At the time,
Plaintiff was taking Lexapro for depression which had been
prescribed by her primary care physician.[9]  Plaintiff's
presenting problems included increased irritability, difficulty
getting out of bed and a 15-pound weight loss.  Plaintiff also
reported that she suffered from panic attacks.  Plaintiff
indicated that she was living with her boyfriend and working 3
days a week as a bartender.  Dr. Mannheimer diagnosed Plaintiff

---

[6] Vicodin is in a class of medications called opiate (narcotic) analgesics that
is used to relieve moderate to severe pain.  Neurontin is used to control
certain types of seizures in people who have epilepsy.  It treats seizures by
decreasing abnormal excitement in the brain.  Depakote is used to treat mania
(episodes of frenzied, abnormally excited mood) in people with bipolar
disorder.  Seroquel is used to treat symptoms of schizophrenia (a mental
illness that causes disturbed or unusual thinking, loss of interest in life,
and strong or inappropriate emotions).  Klonopin is used to relieve panic
attacks.  Medlineplus.

[7] Plaintiff's arguments in support of her motion for summary judgment relate
solely to her mental impairments.  Specifically, Plaintiff contends that the
ALJ failed to include in the RFC assessment all of the limitations caused by
her mental impairments which, in turn, resulted in a deficient hypothetical
question to the VE.  Under the circumstances, the Court's summary of the
evidence will be limited to Plaintiff's mental impairments.

[8] Records of Plaintiff's primary care physician, Dr. Vincente Reyes, reflect
complaints of depression beginning on January 16, 2007.  (R. 178).  In his
decision, the ALJ erroneously states: "The first mention of depression from
the claimant occurred on October 16, 2007 when she reported crying spells and
problems with her boyfriend."  (R. 13).

[9] Lexapro is used to treat depression and generalized anxiety disorder
(excessive worry and tension that disrupts daily life and lasts for 6 months
or longer).  Medlineplus.

4

with major depression and his treatment plan for Plaintiff
included medication and cognitive therapy. (R. 384-87).

Between April 26, 2007 and October 1, 2007, Plaintiff
attended 17 therapy sessions. During 8 of these sessions, Dr.
Mannheimer was consulted regarding adjustment of Plaintiff's
medications due to continuing problems.[10] (R. 367-83).

On October 16, 2007, Plaintiff presented to the Emergency
Department of Jefferson Regional Medical Center stating that she
was depressed and did not want to live. Plaintiff reported that
she cried all the time, and that she had had a fight with her
boyfriend with whom she lived. The physician who performed a
physical examination of Plaintiff described her psychological
status as follows: "Alert and oriented x 3. Is cooperative.
Memory is intact. She seems depressed. No longer wants to live
but has no plan." During a mental health evaluation, Plaintiff

---

[10] For example, on May 30, 2007, Plaintiff reported difficulty sleeping,
irritability and increased crying (R. 381); on June 17, 2007, Plaintiff was
very upset because her boyfriend hit her and she did not feel that she could
live alone (R. 379); on June 28, 2007, Plaintiff's mood remained labile and
she continued to have problems with her temper (R. 377); on July 2, 2007,
Plaintiff had an emergency therapy session due to terrible dreams and night
terrors which were causing anxiety and fear (R. 376); on August 2, 2007,
Plaintiff continued to report nightmares and increased stress relating to her
boyfriend's purchase of a bar/restaurant (R. 374); on August 22, 2007,
Plaintiff reported being easily agitated (R. 373); on August 29, 2007,
Plaintiff reported that her memory remained a problem (R. 372); on September
5, 2007, the therapist instructed Plaintiff when to take a Xanax tablet to
avoid becoming hysterical (R. 371) (Xanax is used to treat anxiety and panic
disorders. Medlineplus); on September 13, 2007, Plaintiff reported constant
crying and difficulty sleeping (R. 370); on September 20, 2007, Plaintiff
reported continued high emotional reaction to events (R. 369); and on October
1, 2007, Plaintiff reported a full blown anxiety attack with racing thoughts
and shaking (R. 367).

"eloped," but the physician indicated that there was no reason to recover or hold her. (R. 179-80).

During a therapy session on November 15, 2007, Plaintiff reported that she had gotten a job baking; that things at home were "1000 times better;" and that she was going to start bartending. (R. 366). Six days later, Plaintiff left a message for her therapist, stating that her medications were not working and that she had just been released from jail for ramming her car into her boyfriend's truck three times after drinking.[11] (R. 366).

During her therapy session on November 28, 2007, Plaintiff reported that she did not feel as if her temper was under control. However, she denied that drinking alcohol was a problem. (R. 365). On January 10, 2008, Plaintiff told the therapist that she had quit baking; that she was working 7 days a week and could not take it; that she was having almost daily panic attacks which caused shaking and confusion; that she was not eating or sleeping; and that her boyfriend was drinking and out of control and his business was falling apart. Dr. Mannheimer was consulted and he prescribed an additional medication for Plaintiff. (R. 363).

---

[11] Apparently, Plaintiff was outraged that her boyfriend wanted her to quit the baking job. (R. 364).

Late in the evening of January 12, 2008, Plaintiff was taken by ambulance to Mercy Hospital with complaints of blackouts. Plaintiff told the triage nurse that two days earlier, she ran her car into her boyfriend's car damaging both vehicles; she threw her boyfriend's belongings out the window; she woke up in the street in the middle of the night; and she did not remember any of it. Plaintiff reported that the problem started the previous year, but recently was getting worse, and that she took Klonopin and performed deep breathing when anxious. Although Plaintiff minimized the impact of alcohol on her behavior, she admitted to drinking three times a week and to two driving under the influence charges in less than 30 days. Plaintiff expressed suicidal ideation by means of "something fast," and she endorsed irritability, erratic sleep and hopelessness. The diagnostic impression included bipolar disorder. Plaintiff was assigned a score of 25 on the Global Assessment of Functioning ("GAF") Scale.[12]   (R. 192, 196, 201, 203-04, 207).

---

[12] The GAF scale is used by clinicians to report an individual's overall level of functioning. The scale does not evaluate impairments caused by physical or environmental factors. The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness. The highest possible score is 100, and the lowest is 1.   A GAF score between 21 and 30 denotes: **"Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriate, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends). American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000), at 34 (bold face in original) ("DSM-IV-TR").

7

As part of the intake process for Mercy Hospital's Inpatient Behavioral Health Unit, Plaintiff underwent a psychiatric evaluation by Dr. Laura Z. Childress-Hazen. Plaintiff reported depression and impulsive thoughts of taking an overdose to commit suicide. Plaintiff described feelings of hopelessness and was overwhelmed by owning a bar/restaurant with her boyfriend. Dr. Childress-Hazen's diagnoses included bipolar disorder and alcohol abuse and she indicated that intermittent explosive disorder needed to be ruled out. She also indicated that Plaintiff's limitations included working in an atmosphere where alcohol was present and problems with her boyfriend. Dr. Childress-Hazen rated Plaintiff's score on the GAF scale a 20.[13] Plaintiff was admitted to the hospital for treatment and discharged on January 15, 2008. (R. 189, 192-94).

During a therapy session on February 6, 2008, Plaintiff reported shaking due to her "nerves." Plaintiff also reported that she had lost 9 pounds. At this time, Plaintiff was cleaning houses 3 days a week. (R. 361). During Plaintiff's therapy session on February 20, 2008, the report from her hospitalization at Mercy Hospital was reviewed. The therapist noted that Plaintiff had "absolutely no insight into [her]

---

[13] A GAF score between 11 and 20 denotes: **"Some danger of hurting self or others** (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g., smears feces) **OR gross impairment in communication** (e.g., largely incoherent or mute). DSM-IV-TR.

8

behavior or illness." (R. 360). During a therapy session on April 2, 2008, Plaintiff reported that she had been off her medications for 2 weeks and her symptoms had increased. Plaintiff also reported that she had applied for welfare and disability benefits. (R. 359).

During an appointment with Dr. Mannheimer on April 21, 2008, Plaintiff indicated that she could not work due to stress. (R. 358). A month later, Plaintiff told her therapist that she was having difficulty sleeping; she felt nervous and jittery; her back was painful; and her mood unstable. The therapist indicated that Dr. Mannheimer would be consulted for a medication adjustment. (R. 356-57).

On May 21, 2008, Dr. Mannheimer completed a questionnaire regarding Plaintiff's mental impairments in which he indicated that he saw Plaintiff intermittently; that her diagnoses included bipolar disorder, alcohol abuse in recent remission and personality disorder; that her GAF score was 50;[14] that Plaintiff's history included episodes of inability to function due to depression, episodes of impulsive behavior and blackouts; that Plaintiff was unemployed and living with her boyfriend; that her appearance was appropriate, her behavior and psychomotor activity were in control, and her mood was depressed

---

[14] A GAF score between 41 and 50 denotes: **"Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers). DSM-IV-TR.

9

and anxious with underlying anger; that her concentration, memory and social judgment were fair; that she had episodes of poor impulse control; and that her insight was poor. As to activities of daily living, Dr. Mannheimer indicated that Plaintiff had "periods of inability to follow through." With regard to social functioning, Dr. Mannheimer indicated that Plaintiff had periods of increased irritability which resulted in difficulty getting along with others. (R. 250-53).

The same day, Dr. Mannheimer completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff. The doctor opined that, due to symptoms of her bipolar disorder, Plaintiff was **markedly** limited in her ability (1) to understand, remember and carry out detailed instructions, (2) to respond appropriately to work pressures in a usual work setting, and (3) to respond to changes in a routine work setting.[15] Dr. Mannheimer further opined that Plaintiff was **moderately** limited in her ability (1) to understand, remember and carry out short, simple instructions, (2) to make judgments on simple work-related decisions, and (3) to interact appropriately with the public, supervisors and co-workers.[16] (R. 255).

---

[15] A "marked" limitation indicates a major limitation in a particular area. The ability to function is severely limited but not precluded. (R. 254).
[16] A "moderate" limitation indicates moderate limitation in an area but the individual is still able to function satisfactorily. (R. 254).

10

During a therapy session on June 11, 2008, Plaintiff indicated that her boyfriend's bar was involved in drug deals, and that she was leaving him when she is awarded disability benefits. The therapist noted that Plaintiff "seems a bit more stable." (R. 355). Thereafter, Plaintiff cancelled therapy sessions scheduled for July 5, 2008 and July 16, 2008, and she failed to show for sessions scheduled for July 24, 2008 and August 20, 2008.

On July 2, 2008, John Rohar, PhD, a non-examining State agency psychological consultant, completed a Psychiatric Review Technique Form in connection with Plaintiff's applications for DIB and SSI. Dr. Rohar opined that Plaintiff did not meet the requirements of Listing 12.04 relating to affective disorders, Listing 12.08 relating to personality disorders, or Listing 12.09 relating to substance addiction disorders.[17] With regard to functional limitations, Dr. Rohar opined that Plaintiff was mildly limited in her activities of daily living; that she was moderately limited in maintain social functioning, concentration, persistence and pace; and that she had not experienced repeated episodes of decompensation, each of an extended duration. (R. 269-81).

---

[17] If a disability claimant's impairment meets or equals an impairment listed in Part 404, Subpart P, Appendix 1 of Title 20 of the Code of Federal Regulations, he or she is conclusively presumed to be disabled. Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

In a Mental RFC Assessment completed the same day, Dr. Rohar indicated that Plaintiff was **markedly limited** in her ability to understand, remember and carry out detailed instructions; **moderately limited** in her ability to (a) understand, remember and carry out short, simple instructions, (b) maintain attention and concentration for extended periods, (c) work in proximity to others without being distracted by them, (d) make simple work-related decisions, (e) complete a normal workday and workweek without interruptions from psychologically based symptoms, (f) perform at a consistent pace without an unreasonable number and length of rest periods, (g) interact appropriately with the public, (h) accept instructions and respond appropriately to criticism from supervisors, (i) get along with coworkers or peers without distracting them or exhibiting behavioral extremes, (j) maintain socially appropriate behavior, and (k) respond appropriately to changes in the work setting; and had **no limitations** in her ability to (a) remember locations and work-like procedures, (b) perform activities within a schedule, maintain regular attendance and be punctual, (c) sustain an ordinary routine without special supervision, (d) ask simple questions or request assistance, (e) be aware of normal hazards and take appropriate precautions, and (f) set realistic goals or make plans independently of others. (R. 265-66).

Plaintiff returned to Dr. Mannheimer on March 9, 2009. She denied alcohol abuse and reported that she was taking her medications as prescribed. Dr. Mannheimer described Plaintiff as "in part remission" and he indicated that her outpatient treatment should continue. (R. 353).

During a therapy session on March 17, 2009, Plaintiff reported manic episodes with racing thoughts and psychomotor agitation, as well as difficulty sleeping. She also reported that she had not consumed alcohol for 18 months. Plaintiff indicated that she had been out of the hospital for 2 weeks. (R. 353).

Dr. Mannheimer performed a psychiatric evaluation of Plaintiff on March 18, 2009. In his report, Dr. Mannheimer noted that Plaintiff recently had been discharged from an 8-day hospital admission for a manic episode.[18] He rated her GAF score a 45. (R. 348-50). The notes of Plaintiff's last therapy session in the record are dated April 6, 2009, and indicate that her appetite was poor; her energy fluctuated; her sleep was poor; and she was scheduled to see Dr. Mannheimer on May 4, 2009. (R. 351).

---

[18] There is no evidence in the record pertaining to this hospitalization. On remand, Plaintiff should be permitted to submit these records into evidence.

## V. ALJ'S DECISION

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months. See 42
U.S.C. § 423(d)(1). A claimant is considered unable to engage
in any substantial gainful activity only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ
must follow a sequential evaluation process. See 20 C.F.R.
§§ 404.1520(a)(4), 416.920(a)(4). The process was described by
the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as
follows:

                    *    *    *

        Pursuant to his statutory authority to implement the
    SSI Program, (footnote omitted) the Secretary has
    promulgated regulations creating a five-step test to
    determine whether an adult claimant is disabled. Bowen v.
    Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted).
    The first two steps involve threshold determinations that
    the claimant is not presently working and has an impairment

which is of the required duration and which significantly
limits his ability to work. See 20 C.F.R. §§ 416.920(a)
through (c)(1989). In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989). If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry. § 416.920(d). If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps. At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience. If the
claimant cannot do his past work or other work, he
qualifies for benefits.

\*   \*   \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one

through four of the sequential evaluation process for making

disability determinations. At step five, the burden shifts to

the Commissioner to consider "vocational factors" (the

claimant's age, education and past work experience) and

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy in

light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546,

550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in Plaintiff's favor: that is, the ALJ found

that Plaintiff had not engaged in substantial gainful activity

since her alleged onset date of disability, and the medical

evidence established that Plaintiff suffers from the following severe impairments: residuals of an anterior cervical laminectomy, degenerative disc disease, asthma, bipolar disorder, a personality disorder, migraines and drug and alcohol abuse in remission  (R. 12).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listings 12.04 and 12.09 relating to affective disorders and substance addiction disorders, respectively.  (R. 13-14).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform light work that does not require (a) rapid, repetitive motion with her bilateral upper extremities, (b) exposure to unprotected heights and dangerous machinery, (c) piece work production rate pace, and (d) more than incidental stooping, kneeling, crouching, crawling, balancing or climbing or change in work processes.[19]  (R. 15).  The ALJ then proceeded to step four, finding that in light of Plaintiff's RFC, she is unable to perform any of her past relevant work.  (R. 16).

---

[19] As noted by Plaintiff, the foregoing hypothetical question contains only one limitation that could be characterized as a mental limitation, i.e., no "piece work production rate pace."

Finally, at step five, considering Plaintiff's age, education, work experience and RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in the national economy, including the jobs of a guard, an information clerk and a cleaner. (R. 16-17

## VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## VII. DISCUSSION

In support of her motion for summary judgment, Plaintiff asserts, among other things, that the ALJ's RFC assessment was insufficient for the Court to determine whether significant

17

probative evidence was not credited or simply ignored by the
ALJ.[20]  The Court agrees.

In Cotter v. Harris, 642 F.2d 700 (3d Cir.1981), a
disability benefits claimant sought judicial review of a
decision of the Secretary of Health and Human Services denying
his applications for DIB and SSI.  The district court granted
the Secretary's motion for summary judgment, and an appeal was
taken by the claimant.  The Court of Appeals for the Third
Circuit held the ruling of the district court that the claimant
was not disabled by his heart condition was required to be
vacated because the ALJ failed to explain his implicit rejection
of evidence which supported the claim or even to acknowledge the
presence of such evidence.  See also Wier v. Heckler, 734 F.2d
955 (3d Cir.1984)("Once again we find that the failure of an
administrative law judge to mention and explain medical evidence
adverse to his position has deprived the Secretary of the
substantial evidence necessary to sustain his determination.");
Fargnoli v. Massanari, 247 F.3d 34 (3d Cir.2001)(Although the

---

[20] Relatedly, Plaintiff asserts that (1) the ALJ failed to give appropriate
weight to the opinion of her treating psychiatrist, Dr. Mannheimer, regarding
the severity of her mental impairments, Rocco v. Heckler, 826 F.2d 1348, 1350
(3d Cir.1987)(A cardinal principle guiding disability eligibility
determinations is that the ALJ accord treating physicians' reports great
weight, especially "when their opinions reflect expert judgment based on a
continuing observation of the patient's condition over a prolonged period of
time."), and (2) the VE's testimony in response to the ALJ's hypothetical
question does not constitute substantial evidence supporting the denial of
Plaintiff's applications for DIB and SSI because it failed to include all of
the limitations resulting from her mental impairments.  (Docket No. 11, pp.
16-17, 21).

ALJ in a Social Security disability case is not expected to make reference to every relevant treatment note in a case where the claimant has voluminous medical records, the ALJ, as the factfinder, is expected to consider and evaluate the medical evidence in the record).

In the present case, the ALJ's discussion of the evidence pertaining to Plaintiff's mental impairments is replete with errors and omissions.[21] **First**, as noted in footnote 8, the ALJ erroneously states that Plaintiff did not complain of depression until October 16, 2007. In fact, the records of her PCP show that Plaintiff began to complain of depression as early as January 2007, and that the PCP prescribed medication for Plaintiff for the depression. **Second**, the ALJ fails to mention Plaintiff's numerous therapy sessions (28), including an emergency session for night terrors, and her presentment to the Emergency Department of Jefferson Regional Medical Center on October 16, 2007 with suicidal thoughts. **Third**, the ALJ rejected Dr. Mannheimer's opinion because the doctor only treated Plaintiff intermittently during the relevant period. Contrary to this finding, Dr. Mannheimer's treatment of Plaintiff was not intermittent. Although Dr. Mannheimer's face-to-face evaluations of Plaintiff were limited, the doctor was

---

[21] The Court notes that the medical records in this case were not voluminous. Nevertheless, the ALJ failed to adequately discuss the records, particularly as they relate to Plaintiff's mental impairments.

19

consulted by Plaintiff's therapist on numerous occasions to make medication adjustments due to ongoing symptoms of Plaintiff's mental impairments. **Fourth**, the ALJ failed to mention the medications prescribed for Plaintiff in an attempt to stabilize her bipolar disorder and panic attacks, which included Depakote, Seroquel, Klonopin and Xanax. **Fifth**, the ALJ rejected Dr. Mannheimer's opinion because "there is no indication that the claimant has marked limitations" with regard to her ability to respond appropriately to work pressures and change in the work setting. In so doing, the ALJ fails to mention the termination of Plaintiff's long-time employment (19 years) as a bartender at The Old Place Inn due to "flipping out," "saying crazy things," and "making scenes" in the restaurant. He also fails to acknowledge references in the notes of Plaintiff's therapist regarding Plaintiff's irritability (R. 381), temper (R. 377), anxiety (R. 376), nightmares and increased stress (R. 374), easy agitation (R. 373), constant crying (R. 370), high emotional reaction to events (R. 369), and a full blown anxiety attack with racing thoughts and shaking (R. 367). **Sixth**, the ALJ fails to mention the evidence which indicates that Plaintiff had been hospitalized for 8 days for a manic episode in March 2009. **Seventh**, the ALJ fails to mention any of Plaintiff's GAF scores during the relevant period (20, 25, 45 and 50) which at best

indicated serious symptoms or impairment and at worst indicated
that she was a danger to herself.[22]

In sum, the ALJ's discussion of the evidence pertaining to
Plaintiff's mental impairments was woefully inadequate.
Accordingly, the case will be remanded to the Commissioner for
further consideration of such evidence and a new RFC assessment
based on all of the evidence in Plaintiff's file.

William L. Standish
United States District Judge

Date: December 7, 2011

---

[22] Although GAF scores alone are not sufficient to establish disability, they
are nevertheless relevant evidence that should be considered by the ALJ.

21